IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

|  |  |
|---|---|
| PAUL WILSON, et al., | |
| Plaintiffs, | 4:20-CV-3128 |
| vs. | |
| HOLLY BURNS, in her official and individual capacity, et al., | MEMORANDUM AND ORDER |
| Defendants. | |

Paul Wilson and Jessica Anshel filed this action, individually and as guardians and next friends of their minor children, alleging constitutional claims arising from the temporary removal of the children from their home following allegations of domestic abuse. *See* filing 1-1. The case is currently before the Court on the separate motions to dismiss filed by the Nebraska Department of Health and Human Services and two of its employees (collectively, the NDHHS defendants) (filing 4) and Holly Burns, a mental health practitioner contracted by the Department to provide therapy to the children (filing 11). The Court will grant the defendants' motions.

That doesn't mean the Department is exonerated. It's fairly clear that the Department could have done a better job of handling this family's situation or, particularly, providing a stable situation for these children. But substandard performance isn't a constitutional violation, and the higher standard for alleging a constitutional violation isn't met here, so this case will be dismissed.

# I. STANDARD OF REVIEW

A complaint must set forth a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). This standard does not require detailed factual allegations, but it demands more than an unadorned accusation. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint need not contain detailed factual allegations, but must provide more than labels and conclusions; and a formulaic recitation of the elements of a cause of action will not suffice. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). For the purposes of a motion to dismiss a court must take all of the factual allegations in the complaint as true, but is not bound to accept as true a legal conclusion couched as a factual allegation. *Id.*

And to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must also contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Iqbal,* 556 U.S. at 678. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*

Determining whether a complaint states a plausible claim for relief will require the reviewing court to draw on its judicial experience and common sense. *Id.* The facts alleged must raise a reasonable expectation that discovery will reveal evidence to substantiate the necessary elements of the plaintiff's claim. *See Twombly*, 550 U.S. at 545. The court must assume the truth of the plaintiff's factual allegations, and a well-pleaded complaint may proceed, even if it strikes a savvy judge that actual proof of those facts is improbable, and that recovery is very remote and unlikely. *Id.* at 556. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of

misconduct, the complaint has alleged—but has not shown—that the pleader is entitled to relief. *Iqbal,* 556 U.S. at 678.

## II. BACKGROUND

Paul and Jessica are the parents of three children—one girl, O.W., and two boys, C.W. and M.W.—who were respectively eight, three, and two years old at the outset of the juvenile court proceeding out of which this case arises. Filing 1-1 at 59. The underlying juvenile court proceeding began in April 2018, when O.W. reported to a teacher at school that she'd seen Paul assault Jessica. Filing 1-1 at 4. Lincoln police contacted Jessica, who admitted that she and Paul had argued although she denied any physical violence. Filing 1-1 at 4. But Paul was arrested and charged with domestic assault and child abuse. Filing 1-1 at 6. Paul ultimately pled no contest to amended charges of assault and disturbing the peace and spent 68 days in custody on the sentence. Filing 1-1 at 6. (The complaint does not indicate what the actual sentence was.)

The day after Paul was arrested, the State moved for an ex parte order of temporary custody in Lancaster County Juvenile Court, alleging that the children were endangered. Filing 1-1 at 4. The affidavit from Lincoln police supporting the motion relied on jail calls in which Paul was told that it had been his daughter who had reported the incident. Filing 1-1 at 5. The children were removed from Paul and Jessica's home the same day and, the next day, the State filed a petition to adjudicate the children pursuant to Neb. Rev. Stat. § 43-247(3)(a). Filing 1-1 at 5-6. Although the complaint doesn't clearly say so, presumably the children were adjudicated, because they remained in the State's custody and were placed in foster care. *See* filing 1-1 at 6-7.

While Paul was still in jail, Jessica participated in supervised visitation with the children. Filing 1-1 at 7. She also asked to participate in other activities—doctor's appointments, school events, and the State Fair—but these

requests were denied by defendant James Colburn, who was the Department's case manager for their case. Filing 1-1 at 3, 7. At a hearing held on June 20, 2018, the juvenile court accepted the recommendations of the Department and Colburn to continue the children's out-of-home placement. Filing 1-1 at 7. The juvenile court also directed the Department to contact Burns regarding visitation and communicate her recommendations to counsel. Filing 1-1 at 7.

The case progressed to a dispositional hearing on August 1, 2018, at which the juvenile court again continued out-of-home placement. Filing 1-1 at 34-35. The juvenile court found that initial removal from the home had been necessary, and placement outside the home continued to be necessary because "the parents have not yet had an opportunity to engage in rehabilitative services and to ensure appropriate oversight and monitoring of the children's safety." Filing 1-1 at 35. The juvenile court also found that the children's needs for safety, health and well-being were being met, services were being provided in compliance with the case plan, fair progress was being made to alleviate the causes of out-of-home placement, and reasonable efforts had been made to prevent the children's removal from the home. Filing 1-1 at 35.

The primary permanency plan for the children was reunification. Filing 1-1 at 35. But the juvenile court reserved ruling, pending further hearing, on whether the Department had made reasonable efforts to reunify the family. Filing 1-1 at 35. The juvenile court set a deadline for October 4, 2018 to review disposition. Filing 1-1 at 37. And the juvenile court set a permanency planning hearing for May 22, 2019. Filing 1-1 at 37.

The juvenile court directed both Jessica and Paul to complete initial diagnostic interviews with a local mental health clinic, and the Department was directed to make the therapists' recommended treatment and services available to them, including payment if no other funding was available. Filing

1-1 at 35-36. Paul was directed to complete a batterer's intervention program as arranged by the Department. Filing 1-1 at 36. Paul and Jessica were each to be provided with supervised visitation as arranged by the Department, and they were not to communicate with one another during visitation. Filing 1-1 at 36. The Department did not recommend joint visitation. Filing 1-1 at 9.

On September 13, 2018, Colburn emailed counsel for the parents and the guardian ad litem indicating that the Department was going to move for a temporary change of placement for O.W., based on Burns' recommendation, "intended to last 30-45 days, with the intention of then returning her to her original placement." Filing 1-1 at 42. It's not clear from the complaint what had happened—the best inference the Court can draw is that O.W. had been moved to respite care from her original foster care placement, and that the "change of placement" was intended to keep her with her respite caretaker for a longer period of time. *See* filing 1-1 at 10, 40-41. What is clear is that a hearing was held on September 19, at which the juvenile court took up the Department's request for change of placement and Jessica's motion to permit joint visitation. Filing 1-1 at 10. The juvenile court approved the change of placement, permitted joint visitation for M.W.'s birthday on September 28, and deferred ruling on further joint visitation until the October 4 review hearing. Filing 1-1 at 10.

At that hearing, the juvenile court found that the children should remain in their then-separate placements outside the home. Filing 1-1 at 10. The juvenile court also maintained separate visitation as arranged by the Department, and ordered Paul and Jessica to complete additional therapy. Filing 1-1 at 10. Joint visitation was not permitted at that time, "but could begin with ten (10) days' notice" and would be allowed for specific special occasions as approved by the Department. Filing 1-1 at 11-12. Paul and Jessica

continued with their therapeutic obligations, continued to exercise individual visitation, and exercised joint visitation on special occasions. Filing 1-1 at 13.

In early November, Jessica's counsel contacted Colburn to ask when the Department would be recommending joint visitation. Filing 1-1 at 13. Colburn replied that the Department would move to permit joint visitation later that month. Filing 1-1 at 13, 46. But a few days later, Colburn told the parties the Department's position had changed, because he had heard from therapists (apparently including Burns) that they were opposed to joint visitation. Filing 1-1 at 15, 47. Burns later allegedly opined at a team meeting with Colburn, the guardian ad litem, and counsel that she didn't believe Paul and Jessica were likely to achieve their goals, and that she would wager on police being called to their home because Paul would drink and become violent. Filing 1-1 at 20.

In mid-November, the foster parents for C.W. and M.W. notified the Department that they couldn't continue as foster parents. Filing 1-1 at 14. Nor could O.W.'s respite care provider take C.W. and M.W. Filing 1-1 at 14. Paul and Jessica had concerns about O.W.'s placement anyway, believing that O.W. was being dropped off at school in the cold before she was permitted into the school building, and that she wasn't being fed properly. Filing 1-1 at 14-15. C.W. and M.W. were placed in another foster home. Filing 1-1 at 15. Paul and Jessica weren't informed about that change until after it happened. Filing 1-1 at 16. And the new foster parents had a long vacation planned for December—it was apparently the only placement available at the time—so C.W. and M.W. would have to be placed in a different respite care for a month. Filing 1-1 at 17, 53. Paul and Jessica were also initially left out of the loop about that move. Filing 1-1 at 17-18, 49-53.

Counsel for Jessica asked if the children could be permitted to return to the home for a few days around Christmas instead of being in respite care.

Filing 1-1 at 18. Colburn's supervisor, defendant Kimberly Lauenroth, denied that request, explaining that the juvenile court had ordered out-of-home placement and joint visitation wasn't permitted except for the approved holiday visit. Filing 1-1 at 19. The Department still opposed joint visitation. Filing 1-1 at 20-21.

During a team meeting on January 8, 2019, Paul asked if he could speak with Burns about O.W.'s therapy. Filing 1-1 at 21. The next day, Burns emailed the parties informing them that during her session with O.W. that day, O.W. had asked why Burns had not called Paul back "for two months." Filing 1-1 at 21, 57-58. Burns was concerned that Paul was talking about the proceedings with O.W., manipulating O.W., and that those conversations weren't documented during the supervised visitations. Filing 1-1 at 21, 56. Burns explained that it was "destructive to the therapeutic relationship" to have Paul suggest to O.W. that it was Burns' fault O.W. hadn't been able to return home. Filing 1-1 at 56. The guardian ad litem, Colburn, and Lauenroth apparently shared that concern, because they all responded opposing unsupervised visitation. Filing 1-1 at 21, 54-57. Colburn allegedly warned a visitation supervisor to "watch her back" with Paul and Jessica because they were manipulative. Filing 1-1 at 22.

In March 2019, Colburn was replaced as case manager. Filing 1-1 at 22. An internal review of his performance on the case indicated that he needed to improve in certain areas. Filing 1-1 at 22. The replacement case manager presented the parties with a new plan for reunification including an "Intensive Family Reunification" program provided by a counseling service, which after a few weeks resulted in the counseling service recommending a two-week trial return of the children to Paul and Jessica's home with support visits provided daily. Filing 1-1 at 24, 88. In the meantime, Burns had also contacted the

parties raising her own concerns about whether O.W. was being fed properly in her respite care, and recommending that O.W. be allowed overnight visits with Paul and Jessica. Filing 1-1 at 23.

So, on May 7, the Department proposed a placement change to return the children to Paul and Jessica, and the juvenile court approved that change. Filing 1-1 at 25. The family successfully completed the Intensive Family Reunification program in June. Filing 1-1 at 89. And the juvenile case was closed by the Department and the juvenile court on September 24.

Paul and Jessica (for themselves and as next friends of their children) filed this suit in the District Court of Lancaster County, Nebraska against the Department and Colburn, Lauenroth, and Burns in their official and individual capacities pursuant to 42 U.S.C. § 1983. Filing 1-1. They seek a declaration that their constitutional rights were violated, and money damages. Filing 1-1 at 31. Burns, with the consent of the NDHHS defendants, removed the case to this Court. Filing 1.

## III. DISCUSSION

The NDHHS defendants move to dismiss the claims against them based on sovereign immunity and the merits, and Burns separately moves for dismissal based on qualified immunity and the merits.

### 1. THE NDHHS DEFENDANTS' MOTION TO DISMISS

The NDHHS defendants have been sued in their official and individual capacities. In their official capacities, they say they're immune from suit, and in their individual capacities, they say the plaintiffs' complaint fails to state a claim against them. The Court will start with the immunity question.

(a) Sovereign Immunity

The plaintiffs are suing under § 1983. *See* filing 1-1 at 27. The NDHHS defendants argue that the Department, and its employees in their official capacities, are immune from suit.[1] That's incontrovertibly true: neither a State nor state officials in their official capacities can be sued for money damages under § 1983. *See, e.g., Lapides*, 535 U.S. at 617; *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989); *Calzone v. Hawley*, 866 F.3d 866, 872 (8th Cir. 2017); *Kruger*, 820 F.3d at 301; *Zajrael v. Harmon*, 677 F.3d 353, 355 (8th Cir. 2012); *McLean v. Gordon*, 548 F.3d 613, 618 (8th Cir. 2008); *Mayorga v. Missouri*, 442 F.3d 1128, 1131 n.2 (8th Cir. 2006). The State of Nebraska has plainly not waived its common-law sovereign immunity to claims such as the plaintiffs'. *See Anthony K. v. State*, 855 N.W.2d 802, 813 (Neb. 2014). The Department of Health and Human Services is plainly part of the State of Nebraska. *See* Neb. Rev. Stat. § 81-601 *et seq.* And the plaintiffs have identified no vehicle other than § 1983 for asserting their constitutional claims.

Instead, the plaintiffs assert that "[t]he State and state actors can be sued directly under §1983 for monetary, declaratory, or injunctive relief where the action that is alleged to be unconstitutional implements or executes a policy

---

[1] The NDHHS defendants suggest that the source of that immunity is the Eleventh Amendment. Filing 5 at 3, 6-7. Of course, that can't be: they voluntarily assented to removal to federal court, waiving any Eleventh Amendment immunity. *See Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 624 (2002). And this isn't the first time the Court has recently explained the difference between Eleventh Amendment immunity and common-law sovereign immunity to the State of Nebraska (including one case in which, like this one, the State was represented by the Nebraska Attorney General's office). *See eScholar LLC v. Nebraska Dep't of Educ.*, 497 F. Supp. 3d 414, 424 (D. Neb. 2020); *see also Trambly v. Bd. of Regents of Univ. of Nebraska*, No. 4:20-CV-3094, 2021 WL 1615506, at *4 (D. Neb. Apr. 26, 2021).

statement, ordinance, regulation or decisions officially adopted and promulgated by that body's officers." Filing 6 at 9. The plaintiffs cite no authority for that proposition, perhaps because there isn't any: in fact, the law is squarely to the contrary.[2] A claim for money damages may be brought against a *municipality* for a governmental policy or custom, or it may be brought against a state or municipal official in his or her personal capacity and need not be connected to a policy or custom… but an official-capacity suit against a *state* official for money damages can't be brought under § 1983. *See, e.g., Hafer v. Melo*, 502 U.S. 21, 25-31 (1991); *Kentucky v. Graham*, 473 U.S. 159, 165-68 (1985); *Anthony K.*, 855 N.W.2d at 537-38.

The only substantial relief sought by the plaintiffs' complaint is money damages. *See* filing 1-1 at 31. In the absence of any allegations showing a "real and immediate threat of repeat injury," they don't have standing to ask for anything else. *See Mitchell v. Dakota Cty. Soc. Servs.*, 959 F.3d 887, 896 (8th Cir. 2020). Accordingly, their claims against the Department and the other official-capacity defendants will be dismissed.

### (b) Individual-Capacity Claims

The complaint alleges three causes of action against Colburn and Lauenroth in their individual capacities, captioned as: (1) "42 USC 1983," (2) "Violation of Constitutionally Protected Right to Familial Integrity," and (3) "Equal Protection Claim." Filing 1-1 at 26-31. But § 1983 isn't a source of substantive rights—just a means to assert rights conferred elsewhere—so it's not a separate claim. *See Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979).

---

[2] The Court isn't quite sure what to make of the plaintiffs' brief, given that the NDHHS defendants cited to *Will* and other authority which should have made plain that sovereign immunity barred the plaintiffs' § 1983 claims. *See* filing 5 at 5-7.

Parents and children share a right to mutual care and companionship that's a liberty interest protected by the substantive and procedural due process clauses of the 14th Amendment. *See Mitchell*, 959 F.3d at 897. And, of course, the 14th Amendment also protects the right to equal protection of the laws.

The complaint additionally refers to several provisions of the Nebraska Constitution, filing 1-1 at 29-20, but Nebraska law doesn't permit a direct cause of action against a state official for violation of a state constitutional provision, *see McKenna v. Julian*, 763 N.W.2d 384, 391 (Neb. 2009), *abrogated on other grounds*, *Doe v. Bd. of Regents of Univ. of Neb.*, 788 N.W.2d 264 (Neb. 2010); *see also Stamm v. Cnty. of Cheyenne, Neb.*, 326 F. Supp. 3d 832, 844 (D. Neb. 2018); *Biby v. Bd. of Regents of Univ. of Neb. at Lincoln*, 340 F. Supp. 2d 1031, 1036 (D. Neb. 2004), *aff'd*, 419 F.3d 845 (8th Cir. 2005). There's also a passing reference to violation of Neb. Rev. Stat. § 43-283.01, filing 1-1 at 30, but it hasn't been mentioned since, and the plaintiffs offer no basis to conclude that there's a private right of action under Nebraska law to enforce it, *see Pro. Mgmt. Midwest, Inc. v. Lund Co.*, 826 N.W.2d 225, 233 (Neb. 2012); *cf. In re Int. of Nizigiyimana R.*, 889 N.W.2d 362, 375 (Neb. 2016). Accordingly, the Court's analysis is limited to federal substantive due process, procedural due process, and equal protection claims.

Usually, the Court would be considering whether state employees in their individual capacities were entitled to qualified immunity. *See Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982). And the Court recognizes the importance of resolving qualified immunity questions early in litigation. *See Payne v. Britten*, 749 F.3d 697, 701 (8th Cir. 2014). But qualified immunity is a defense that must be raised, *see Gomez v. Toledo*, 446 U.S. 635, 641 (1980), and here, Colburn and Lauenroth didn't raise it, *see* filing 5. So, the Court applies ordinary motion-to-dismiss standards to the claims against them.

*(i) Substantive Due Process*

Parents have a recognized liberty interest in the care, custody, and management of their children, and children and parents also share a liberty interest in their mutual care and companionship. *Mitchell*, 959 F.3d at 897. But the right to family integrity does not include a constitutional right to be free from child abuse investigations, and the government has a compelling interest in protecting minor children, especially when it is necessary to protect them from their parents. *Id*.

To state a substantive due process claim against a state official, a plaintiff must demonstrate that a fundamental right was violated and that the official's conduct shocks the conscience. *Id*. at 898. Whether conduct shocks the conscience is a question of law. "Conscience-shocking conduct only includes the most severe violations of individual rights that result from the brutal and inhumane abuse of official power." *Id*. And only a purpose to cause harm unrelated to the legitimate object of the government action in question will satisfy the necessary element of arbitrary, conscience-shocking conduct. *Id*.

So, for instance, in *Mitchell*, the Eighth Circuit held that a father failed to state a claim for a substantive due process violation after his children were removed from his home because he spanked them. *Id*. at 895. The children remained out of the home for 22 months before they were returned, and at the emergency hearing held after removal, the state case worker allegedly told the father that she would "do everything in [her] power to see that the children are never returned to your custody" and asked him "Why are all black families so quick to spank their children? You are unfit to be parents and don't deserve to have children." *Id*. But, the Court of Appeals explained, while the caseworker's statements were "unprofessional, inappropriate, and unacceptable," they did "not rise to the level of 'conscience shocking behavior' under our precedent." *Id*.

at 898. Belief in an improper investigation and unprofessionalism by a social worker are not enough to violate a plaintiff's constitutional rights. *Id.* (citing *Thomason v. SCAN Volunteer Servs., Inc.*, 85 F.3d 1365, 1372 (8th Cir. 1996)).

The same is true here: while there may be circumstances to criticize about the Department's handling of this case, it doesn't shock the conscience. There are no facts alleged that would support a conclusion that either Colburn or Lauenroth acted intending "to cause harm unrelated to the legitimate object of the government action in question." *See Mitchell*, 959 F.3d at 898. Nor is there any factual basis to infer that either defendant was *deliberately* indifferent. *See Folkerts v. City of Waverly, Iowa*, 707 F.3d 975, 980 (8th Cir. 2013); *see also Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1906 (2018).

In arguing to the contrary, the plaintiffs focus on the sequence of events in November and December 2018, when the children were moved from placement to placement and Paul and Jessica weren't informed of some of those moves until after they happened. Filing 6 at 12-15; *see* filing 1-1 at 14-18; 49-53. Those facts, they argue, "beg the answer to the question: what is considered 'the most severe violation of individual rights that result from the brutal and inhumane abuse of official power' if it is not denying a parent the right to know where their children lay their head at on Christmas night." Filing 6 at 15.

The plaintiffs' hyperbole is neither persuasive nor warranted. To begin with, it's factually contradicted by the record—a December 19, 2018 email from Lauenroth to counsel explained where the children would be for the following month, including the holidays. Filing 1-1 at 53. But even considering that period more broadly, the only conclusion supported by the pleadings is that the children were moved around because the Department was struggling to place them, and Paul and Jessica weren't always kept informed because of bureaucratic lapses. And those lapses simply meant Paul and Jessica weren't

told about some moves until after the fact—they weren't, for instance, left to believe that the children were missing.

It's obvious that a better job could have been done placing the children (although that could be attributable at least as much to a lack of resources as to mismanagement). And it's obvious that Colburn and others could have communicated better—he admitted as much, noting that he'd missed some messages because he'd been ill and out-of-office. Filing 1-1 at 52. But nothing about that approaches the standard for a substantive due process claim. *See, e.g.*, *Mitchell*, 959 F.3d at 898-99. Mere negligence is never enough. *Braun v. Burke*, 983 F.3d 999, 1002 (8th Cir. 2020).

The plaintiffs also complain more broadly about "their participation in unnecessary programs, the [defendants'] failure to justify their position that the safety of the minor children was at continued risk, and that the [defendants] essentially 'dragged their feet' in efforts at family reunification without explanation[.]" Filing 1-1 at 15. But that too falls well short of the standard for a substantive due process violation, because each and every one of those allegations, even if true, is related to an abuse investigation and juvenile dependency proceeding—in other words, related to legitimate objects of government action.[3] *See Mitchell*, 959 F.3d at 898. The juvenile proceeding began because Paul and Jessica's eight-year-old daughter apparently saw a domestic assault that upset her enough to report it to her schoolteacher—a report that resulted in Paul being convicted of assault and spending 68 days in jail. *See* filing 1-1 at 4-6. The plaintiffs haven't alleged anything suggesting that Colburn and Lauenroth—even if either or both of them acted mistakenly or unwisely—acted outside the legitimate scope of that proceeding.

---

[3] Their argument also comes close to raising a collateral attack on the juvenile court's orders, *but see Peschong v. Children's Healthcare*, 917 F.3d 656, 659-61 (8th Cir. 2019).

To shock the conscience, a defendant's conduct must be so severe, so disproportionate to the need presented, and "so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." *Andrews v. Schafer*, 888 F.3d 981, 984 (8th Cir. 2018). No such conduct is alleged here.

### *(ii) Procedural Due Process*

Procedurally, the Due Process Clause requires that the person whose rights are being interfered with receives notice and has an opportunity to be heard at a meaningful time and in a meaningful manner. *Mitchell*, 959 F.3d at 897. In child removal cases, the meaningful time and manner requirement means that the state must hold a hearing promptly after removal. *Id.*; *see Webb as next friend of K. S. v. Smith*, 936 F.3d 808, 815 (8th Cir. 2019); *Swipies v. Kofka*, 419 F.3d 709, 715 (8th Cir. 2005); *Whisman Through Whisman v. Rinehart*, 119 F.3d 1303, 1311 (8th Cir. 1997). And here, the petition for adjudication was filed the day after the children were removed from the home. Filing 1-1 at 5. While the pleadings don't establish when the juvenile court held its first contested hearing, the Department did its part by filing the petition. *See Webb*, 936 F.3d at 815.

But that's not what the plaintiffs are complaining about—nor, in fact, could they, given that the claims being considered are individual-capacity claims against Colburn and Lauenroth, and nothing in the pleadings puts them in the narrative sooner than nearly 2 months later. *See* filing 1-1 at 6. Instead:

> Plaintiffs contend that the State Defendants, by and through the actions perpetrated by James Colburn and Kimberly Lauenroth, put on a façade of procedure. Together, the Defendants made

misrepresentations to the Court, disallowing the Plaintiffs' efforts and participation in services proper consideration by the court and inhibiting Plaintiffs' progress in the case; the Defendants made misrepresentations to visitation workers regarding the Wilsons, resulting in biases towards the Plaintiffs in the initial meetings with new visitation workers; the Defendants failed to schedule regular team meetings, further delaying the relay of communication between the parties and ability for decision makers to make educated evaluations on the placement of the minor children and the level of visitation the Plaintiffs were permitted to exercise; Defendants failed to provide service providers with Letters of Authority in due time, delaying the Plaintiffs ability to participate in court ordered services and thus delaying the completion of requirements and case progression.

Filing 6 at 12.

To begin with, it's not clear how much of that argument is supported by the actual complaint. It's not hard to plead that someone lied—"The defendant said _____ knowing it wasn't true"—but the Court can't find anything in the pleadings actually identifying an allegedly false statement from Colburn or Lauenroth. The closest the complaint comes is alleging that Colburn told a visitation worker that Jessica and Paul were manipulative—a statement of opinion difficult to prove objectively false, to start with, and in any event a statement from which no apparent consequences ensued.[4]

---

[4] The complaint, rather, takes more issue with what Paul and Jessica were ordered to do, and whether there was sufficient evidence to warrant ordering them to do it, *see* filing 1-1 at 28-

But even if there were allegations to support that argument, the plaintiffs direct the Court to no authority suggesting that such allegations would describe a procedural due process violation. Procedural due process requires only the opportunity to be heard at a meaningful time and in a meaningful manner. *Bremer v. Johnson*, 834 F.3d 925, 932-33 (8th Cir. 2016). And the right to a judicial hearing is the classic protection provided by the Due Process Clause against arbitrary deprivations of life, liberty, or property. *Missouri Roundtable for Life v. Carnahan*, 676 F.3d 665, 677 (8th Cir. 2012). The allegations here describe a series of judicial hearings, at which Paul and Jessica were represented by counsel and a guardian ad litem represented the children, in addition to admittedly imperfect but nonetheless regular communications and meetings with the Department.

In short, the complaint doesn't allege that the plaintiffs were denied a meaningful opportunity to present their case or that any procedural safeguards were lacking. *See Mitchell*, 959 F.3d at 899. Accordingly, their procedural due process claim fails.

### (iii) Equal Protection

The plaintiffs' equal protection claim is cursory, merely incorporating previously alleged facts and asserting that they're in violation of the Equal Protection Clause. Filing 1-1 at 31. It's not clear what sort of equal protection violation that's meant to be. But essentially, the Equal Protection Clause directs that all persons similarly situated should be treated alike. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Unequal treatment of those who are entitled to be treated alike is a denial of equal

---

29—allegations that again look more like a collateral attack on the juvenile court's orders, *but see Peschong*, 917 F.3d at 659-61.

protection if—and only if—an element of intentional or purposeful discrimination is present in it. *See Robbins v. Becker*, 794 F.3d 988, 995 (8th Cir. 2015). So, the first step in an equal protection case is determining whether the plaintiffs have demonstrated that they were treated differently than others who were similarly situated to them. *In re Kemp*, 894 F.3d 900, 909 (8th Cir. 2018). Absent that threshold showing, the plaintiffs don't have a viable equal protection claim. *Id.*; *see Adam & Eve Jonesboro, LLC v. Perrin*, 933 F.3d 951, 960 (8th Cir. 2019).

And they don't clear that threshold here: the pleadings neither allege nor imply that the plaintiffs are in a protected class, nor do they suggest that any similarly situated people were treated differently. *See* filing 1-1. Their brief in response to the NDHHS defendants' motion to dismiss asserts that they're "members of a protected class based on their race, African American." Filing 6 at 16. It would have been better to actually plead that. But even assuming the complaint could be amended to allege that much, the plaintiffs' argument still falls short: they insist that

> the Defendants' Motion to Dismiss the Plaintiffs' Equal Protection claim should be overruled even if the Court were to find that the Plaintiffs failed to allege specific facts as to how their treatment was different or less favorable than other individuals involved with the Department or comparable persons, as there is a reasonable expectation that discovery will reveal evidence of the claim.

Filing 6 at 16. What, reasonably, would lead the Court to expect that? Pleading the necessary elements of the claim is how a plaintiff raises an expectation that discovery might reveal evidence to substantiate them. *See Twombly*, 550 U.S. at 545. And the good faith of state officers and the validity of their actions are

presumed, so the burden of showing otherwise is on the complaining party. *Robbins*, 794 F.3d at 995; *see Mitchell*, 959 F.3d at 899. Without pleading that they were treated differently than others who were similarly situated, the plaintiffs don't state a claim. *See Kemp*, 894 F.3d at 909-10; *Johnson v. City of Minneapolis*, 152 F.3d 859, 862 (8th Cir. 1998).

## 2. BURNS' MOTION TO DISMISS

Burns presents three arguments in support of her motion: (1) she didn't act under color of state law, (2) even if she did the complaint doesn't state a claim for a constitutional violation, and (3) even if it did she would be entitled to qualified immunity. Filing 11 at 1-2. The Court agrees on two of those points, which are each enough to warrant dismissal of the claims against Burns.

### (a) Color of State Law

 "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, *and must show that the alleged deprivation was committed by a person acting under color of state law*." *West v. Atkins*, 487 U.S. 42, 48 (1988) (emphasis supplied). "[A]cting under color of state law requires that the defendant in a § 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West*, 487 U.S. at 49 (quotation omitted).

A private actor can be considered to act under color of state law "if, though only if, there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (quotation omitted). This "close nexus" exists where the private party is "a willful participant in joint activity with the State in denying

a plaintiff's constitutional rights." *Magee v. Trustees of Hamline Univ., Minn.*, 747 F.3d 532, 536 (8th Cir. 2014) (quotation omitted). Thus, to survive a motion to dismiss, a "plaintiff must plausibly allege a mutual understanding, or a meeting of the minds, between the private party and the state actor." *Id.* In doing so, the plaintiffs must allege something more than "multiple contacts" between the private party and the state; rather, they must plead "specific facts plausibly connecting" the alleged concerted action to the alleged violation. *Id.*

Inquiry into the nexus between the state and the challenged action "is necessarily fact intensive," *Ramirez-Peyro v. Holder*, 574 F.3d 893, 901 (8th Cir. 2009), but the Supreme Court has identified "a host of facts that can bear on the fairness of" attributing the challenged action to the state, *see Brentwood Acad.*, 531 U.S. at 296.

> We have, for example, held that a challenged activity may be state action when it results from the State's exercise of coercive power, when the State provides significant encouragement, either overt or covert, or when a private actor operates as a willful participant in joint activity with the State or its agents. We have treated a nominally private entity as a state actor when it is controlled by an agency of the State, when it has been delegated a public function by the State, when it is entwined with governmental policies, or when government is entwined in its management or control.

*Id.* (cleaned up).

Here, what the complaint alleges is that Burns "acted in an official capacity" as O.W.'s therapist "by and through orders of the Lancaster County Juvenile Court" and "contracted to work with NDHHS." Filing 1-1 at 3. But as

Burns points out, the allegations found in the complaint don't suggest that Burns was performing a delegated public function—she was a child's therapist—or that Burns was being compelled by the State to violate anyone's constitutional rights. Filing 11 at 7-10. The plaintiffs don't seem to disagree, because their response collapses to whether there was a "sufficiently close nexus" between the State and Burns' challenged actions to attribute her conduct to the State. *See* filing 15 at 8. And they point to communications between Burns and the Department in which Burns opined on what was in O.W.'s best interests. *See* filing 15 at 9.[5]

But that's not enough. As Burns points out, although she was retained by the Department to provide therapy to O.W., her *duty* ran to O.W., not the Department. The plaintiffs have not alleged any acts on her part inconsistent with her performance of that duty to her patient. And this Court has previously concluded, on similar facts, that a medical care provider retained to treat a juvenile in State custody doesn't act under color of state law. *Anderson v. Nebraska*, No. 4:17-CV-3073, 2018 WL 3913732, at *6-7 (D. Neb. Aug. 15, 2018) (*citing Anderson v. Nebraska*, No. 4:17-CV-3073, 2018 WL 3009115, at *8-12 (D. Neb. June 15, 2018)). The Court stands by that conclusion.

---

[5] The plaintiffs again suggest that discovery might reveal something else: they argue that "it can be assumed that additional communications, both oral and written, occurred between State actors and Defendant Burns that would be discoverable and further support a finding that such a close nexus existed between Defendant Burns and the State." Filing 15 at 9. But that cannot be "assumed"—that's what pleadings are for. *See Iqbal,* 556 U.S. at 678. The plaintiffs suggest no more than the mere *possibility* of misconduct, meaning that they're not entitled to relief. *See id.*

(b) Failure to State a Claim

Burns also argues that the complaint fails to state a claim for any constitutional violation. For the same reasons explained above, the Court agrees: the complaint comes no closer to stating a claim against Burns as it does to stating a claim against Colburn or Lauenroth—in fact, the plaintiffs' allegations against Burns are less substantial.

Most of the plaintiffs' arguments about Burns rest upon variations on the same theme: that

> Defendant Burns's professional recommendations and opinions she provided throughout the Plaintiffs' Lancaster County Juvenile Court case went above and beyond Defendant Burns's therapeutic relationship with [O.W.]. Based on the evidence the Plaintiffs had direct knowledge of at the time they filed the Complaint, Defendant Burns provided professional recommendations and opinions regarding the mental health of Paul and Jessica without having personally seen them in a therapeutic capacity. Defendant Burns failed to establish a valid therapist-client relationship before forming opinions regarding each Plaintiff and provided those opinions along with recommendations for case progression to NDHHS.

Filing 15 at 11. But the pleadings don't support that argument: rather, what's actually alleged is entirely consistent with Burns opining about Paul and Jessica in the context of how their relationship affected O.W. and, for instance, whether joint visitation with O.W. was in her best interests. Paul had been convicted of assault and Burns was treating the child who had first reported the crime, and Burns' opinions were undoubtedly shaped by that. But there's

nothing to suggest they were inappropriate or, more importantly, motivated by malice instead of professional judgment. And it was Burns who sent the April 10, 2019 email recommending O.W. begin having overnights at home, filing 1-1 at 22, which is hardly consistent with the irrational or arbitrary animus that could support a constitutional violation.

What the pleadings show is that Burns had opinions with which Paul and Jessica disagree. They characterize that as her "unprofessional conduct and departure from professional ethics." Filing 15 at 18. But even allegedly unprofessional behavior wouldn't meet the requirements for a constitutional violation, and those requirements aren't met here.

### (c) Qualified Immunity

Although the Department's actual employees don't argue for qualified immunity, Burns does. Filing 11 at 17-19. And although the plaintiffs disagree on the merits of that argument, they don't seem to dispute her right to make it. *See* filing 15 at 10. But it's not that simple.

Qualified immunity shields *public officials* from liability for civil damages if their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Dillard v. O'Kelley*, 961 F.3d 1048, 1052 (8th Cir. 2020), *cert. denied,* 141 S. Ct. 1071 (2021). But private individuals may claim such immunity only under certain circumstances—the availability of qualified immunity to private parties performing governmental functions depends on the common law as it existed when Congress enacted § 1983 in 1871, and the policy reasons the Supreme Court has given for recognizing immunity under § 1983. *Sanchez v. Oliver*, 995 F.3d 461, 466-67 (5th Cir. 2021); *Tanner v. McMurray*, 989 F.3d 860, 867 (10th Cir. 2021); *Bracken v. Okura*, 869 F.3d 771, 777 (9th Cir. 2017); *McCullum v. Tepe*, 693 F.3d 696, 700 (6th Cir. 2012); *see Filarsky v. Delia*, 566 U.S. 377, 383-

94 (2012). Those purposes include preventing timidity in the exercise of official duties, ensuring that skilled candidates are not deterred from public service by the threat of liability, and protecting public employees from distracting litigation. *See Sanchez*, 995 F.3d at 466; *Tanner*, 989 F.3d at 869.

But as the Tenth Circuit recently explained in *Tanner*, there's little to suggest a common-law tradition for private medical professionals, even when working directly for the state (much less private medical professionals who are simply contracted to provide medical care for a state ward). *See* 898 F.3d at 868-69; *see also Sanchez*, 995 F.3d at 468-69 (collecting cases). Nor, as the Tenth Circuit also noted, is the threat of constitutional litigation any more daunting than the ordinary risk of medical malpractice claims. *Tanner*, 989 F.3d at 869-70; *accord Sanchez*, 995 F.3d at 470. The behavior of medical professionals contracted by the state is much more likely to be dictated by their professional duties and standards, not the threat of civil rights claims or immunity from such claims. *See Tanner*, 989 F.3d at 869-70.

Accordingly, the Court finds that neither the common law nor the policy rationales for qualified immunity counsel in favor of extending that defense to Burns on the facts presented here. But that's in large measure because she didn't act under color of state law, which means she really didn't need an immunity defense in the first place. And, most significantly, the complaint didn't state a claim for a constitutional violation anyway.

## IV. CONCLUSION

The Department and the official-capacity defendants are entitled to dismissal based on sovereign immunity, all the individual-capacity defendants are entitled to dismissal because the complaint doesn't state a claim for a constitutional violation, and Burns is additionally entitled to dismissal because she didn't act under color of state law. Accordingly,

IT IS ORDERED:

1.    The NDHHS defendants' motion to dismiss (filing 4) is granted.

2.    Burns' motion to dismiss (filing 11) is granted.

3.    The plaintiffs' complaint is dismissed.

4.    A separate judgment will be entered.

Dated this 2nd day of June, 2021.

BY THE COURT:

John M. Gerrard
Chief United States District Judge